IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, Plaintiff, v. COQUEST INC., BUTTONWOOD LLC, WEVA PROPERTIES LTD., DENNIS WEINMANN, and JOHN VASSALLO, Defendants. | Case No.: 3:21-cv-2599 |

## COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

Plaintiff Commodity Futures Trading Commission (the "Commission") alleges as follows:

### I.  SUMMARY

1.      Beginning on or about May 28, 2015, and continuing through at least November 1, 2019 (the "relevant period"), customers of Defendant Coquest Inc. ("Coquest"), an introducing broker ("IB") registered with the Commission, contacted Defendant Dennis Weinmann ("Weinmann"), in his capacity as a registered associated person ("AP") of Coquest, to broker the best price at which other potential counterparties would be willing to make block trades for commodity futures and options on futures with them.  However, in violation of duties of trust and confidence owed to Coquest customers, on more than 2,000 occasions, Weinmann used material, nonpublic information relating to Coquest customers, such as their identities, trading activity, positions, and the prices at which they were willing to buy or sell, in order to broker and execute block trades opposite the Coquest customers on behalf, and to the benefit, of Defendants

Buttonwood LLC ("Buttonwood") and Weva Properties Ltd. ("Weva"), over which Weinmann had discretionary trading authority and personal financial interests.  In fact, rather than seeking out the best market price and offering it to Coquest's customers, Weinmann routinely quoted those customers only the prices at which he was willing to transact beneficially on behalf of Buttonwood and Weva, without disclosing to Coquest customers that, instead of acting as a broker, he was acting as a counterparty on behalf of Buttonwood and Weva, trading opposite Coquest customer orders.

2.      Weinmann benefitted financially from Buttonwood and Weva's profitable trades against Coquest customers because he was the 50% owner of Buttonwood and Weva and his own assets were invested in the Buttonwood and Weva commodity trading accounts.

3.      Defendant John Vassallo ("Vassallo") also received Coquest customer block trade orders in his capacity as an AP for Coquest and he brokered those orders opposite Weinmann, who traded on behalf of Buttonwood or Weva.  Vassallo knew that Buttonwood or Weva was trading opposite Coquest customers' orders, but Vassallo, like Weinmann, did not disclose to Coquest customers that he partially owned or controlled those counterparties that were taking the opposite side of their orders.  Vassallo also benefitted financially from Buttonwood and Weva's profitable trades against Coquest customers because he was the 50% owner of Buttonwood and Weva and his own assets were invested in the Buttonwood and Weva commodity trading accounts.

4.      Coquest failed to institute policies or procedures to monitor Weinmann's block trading on behalf of Buttonwood and Weva and to minimize the readily apparent conflicts of interest, including by ensuring that Weinmann did not misuse the material, nonpublic information to which he had access by reason of his role as a block trade broker.  For example, Coquest had no rules in place about whether its brokers could trade against Coquest clients, and it made no effort to

review Weinmann's trading on behalf of Buttonwood and Weva for insider trading, frontrunning, or other potential trading abuses.

5.      By this conduct and further conduct described herein, Coquest, Buttonwood, and Weinmann have engaged, are engaging, or are about to engage in acts and practices that violate Sections 4b(a)(1)(A), (B), and (C), and 6(c)(1) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C), 9(1) (2018), and Regulations 155.4, 166.3, and 180.1(a)(1)-(3), 17 C.F.R. §§ 155.4, 166.3, 180.1(a)(1)-(3) (2020).

6.      By this conduct and further conduct described herein, Weva has engaged, is engaging, or is about to engage in acts and practices that violate 7 U.S.C. §§ 6b(a)(1)(A)-(C) and 9(1) and 17 C.F.R. §§ 155.4 and 180.1(a)(1)-(3).

7.      By this and further conduct described herein, Vassallo has engaged, is engaging, or is about to engage in acts or practices that violate 17 C.F.R. §§ 155.4 and 166.3.

8.      The Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition, the Commission seeks civil monetary penalties and such other equitable relief as this Court deems necessary and appropriate.

## II.      JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

3

10.     Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) (2018) because all Defendants reside and transact business in this District and certain transactions, acts, and practices alleged in this Complaint occurred, are occurring, and/or are about to occur within this District.

### III.    PARTIES

11.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations promulgated thereunder.

12.     Defendant **Coquest Inc.** is a Texas corporation located in Dallas, Texas.  Coquest has been registered with the Commission as an IB since 1990.  Coquest has also been registered with the Commission as a commodity trading advisor ("CTA") from 1990-2012 and from 2020 to the present, and as a commodity pool operator from 1990-1994 and from 2010 to the present. Coquest executes block trades in futures and options on behalf of brokerage customers, and Coquest's individual brokers are registered with the Commission as APs of Coquest.  Coquest is owned by Defendants Dennis Weinmann and John Vassallo in a 50/50 partnership.

13.     Defendant **Buttonwood LLC** is a Texas limited liability company located in Dallas, Texas.  Buttonwood has been registered with the Commission as a CTA since 2014.  Buttonwood trades commodity futures and options out of a single account, called the Galaxy Plus Fund, which solicits funds from customers.  Buttonwood is owned by Weinmann and Vassallo in a 50/50 partnership.

14.     Defendant **Weva Properties Ltd.** is a Texas company located in Dallas, Texas. Weva is not registered with the Commission.  Weva trades commodity futures and options in a proprietary account on behalf of its owners, Weinmann and Vassallo, who own Weva in a 50/50 partnership.

4

15.     Defendant **Dennis Weinmann** is a resident of Dallas, Texas.  Weinmann is a 50%
owner of Coquest, where he serves as vice president and acts as an AP and block trade broker.
Weinmann is also a 50% owner of Buttonwood and Weva, where he works as a commodities trader.
Weinmann has been listed with the National Futures Association ("NFA") as a principal and
registered with the Commission as an AP of Coquest since 1990.  Weinmann has served been listed
as a principal with NFA and registered with the Commission as an AP of Buttonwood since 2014.

16.     Defendant **John Vassallo** is a resident of Dallas, Texas.  Vassallo is a 50% owner of
Coquest, where he serves as, among other things, president and compliance officer, and acts as an
AP and block trade broker.  Vassallo is also a 50% owner of Buttonwood and Weva.  Vassallo has
been listed as a principal with NFA and registered with the Commission as an AP of Coquest since
1990.  Vassallo has been listed as a principal with NFA and registered with the Commission as an
AP of Buttonwood since 2014.

## IV.     OTHER RELEVANT ENTITIES

17.     **New York Mercantile Exchange** ("NYMEX") is and was, at all times during the
relevant period, a Delaware corporation, a board of trade designated as a contract market, and self-
regulatory organization.  NYMEX is located in New York, New York and lists many futures and
options contracts on a wide range of products including crude oil and natural gas.  NYMEX is
owned and operated by CME Group Inc. ("CME").  Some of the unlawful conduct described in this
Complaint was in connection with the trading of futures and options contracts listed for trading on
NYMEX and subject to its rules and regulations.

18.     **ICE Futures U.S.** ("ICE") is and was, at all times during the relevant period, a
Delaware corporation, a board of trade designated as a contract market, and self-regulatory
organization.  ICE is located in New York, New York and lists many futures and options contracts
on a wide range of products including crude oil and natural gas.  Some of the unlawful conduct

described in this Complaint was in connection with the trading of futures and options contracts listed for trading on ICE and subject to its rules and regulations.

## V.    FACTS

### A. Market Fundamentals

19.     A futures contract is an agreement to purchase or sell a commodity for delivery or cash settlement in the future:  (1) at a price that is determined at initiation of the contract; (2) which obligates each party to the contract to fulfill the contract at the specified price; (3) which is used to assume or shift price risk; and (4) which may be satisfied by delivery or offset.  A futures contract traded on an exchange has standard, non-negotiable contract specifications.

20.     An option on a futures contract gives the buyer the right, but not the obligation, to buy or sell a specific futures contract at a specific price on or before the option's expiration date.

21.     An "order," in the context of a dealings between a customer and broker, is an instruction or authorization provided by a customer to a broker regarding trading in a commodity interest on behalf of the customer.  Typically, an order will consist of a request to buy (that is, "bid") or sell (that is, "offer" or "ask") a certain quantity (number of contracts) of a specified futures or options contract.  A transaction occurs (this is often referred to as a "fill" or "trade" or "execution") when an order to buy matches with an order to sell.

22.     A block trade is a permissible, privately negotiated transaction of typically a large number of contracts (either at or exceeding an exchange-determined minimum threshold quantity of futures or options contracts) which is executed by agreement apart and way from the open outcry or electronic markets, and then reported as executed on an exchange's trading facility, as permitted under exchange rules.  CME Rule 526 and ICE Rule 4.07 set forth requirements for executing and reporting block trades on the NYMEX and ICE exchanges, respectively.

**B.  Defendants' Obligation to Protect Confidential Customer Information**

23.     At all relevant times, Defendants owed duties of trust and confidentiality to Coquest customers by law, by rule, and by understanding.

24.     Pursuant to Regulation 155.1, 17 C.F.R. § 155.1 (2020), Weinmann and Vassallo were affiliated persons of Coquest at all relevant times, insofar as they were both officers, APs, and owners with more than ten percent interests.

25.     At all relevant times, Regulation 155.4(a), 17 C.F.R. § 155.4(a) (2020), required that Coquest establish and enforce internal procedures to ensure that the firm and its affiliated persons did not use their knowledge of customer orders to trade ahead of or against the interests of such customers for their own benefit or for the benefit of accounts in which they have an interest.

26.     At all relevant times, Regulation 155.4(b)(2), 17 C.F.R. § 155.4(b)(2) (2020), prohibited Weinmann and Vassallo from trading against orders submitted by Coquest customers without the customers' prior consent.

27.     After Weinmann brokered block trades for Coquest customers, Coquest sent trade confirmations to its customers setting forth the terms of the deal, including the commodity, the price, the volume, and the fee or commission due and payable to Coquest for brokerage services. At the bottom of each trade confirmation, Coquest included the following statement:  "Buyer and Seller understand that Coquest, Inc. has acted as agent for both parties *solely for the purpose of matching up the parties to this transaction*."  (emphasis added)

**C.  Undisclosed Conflict of Interest**

28.     During the relevant period, certain customers engaged Coquest for the purpose of buying or selling futures or options contracts via block trades.  In the course of these broker/customer relationships, Coquest and its block trade brokers were afforded access to confidential information relating to customers, including their interest in buying or selling particular

7

contracts, the prices at which they were interested in buying or selling, and sometimes their market positions and trading history.

29. Customers provided Coquest and its brokers with access to such confidential information with the understanding and the expectation that the information would be used to arrange block trades with third parties, and would not otherwise be used to the customers' disadvantage.

30. During the relevant period, Coquest customers communicated their block trading interest to Weinmann and Vassallo believing that Coquest brokers were acting solely in the capacity of a block trade broker.

31. During the relevant period, Coquest customers were unaware, and Weinmann and Vassallo did not disclose, that Weinmann and Vassallo secretly were block trading in the same contracts and at the same time as those customers on behalf of Buttonwood and Weva accounts in which Weinmann and Vassallo had a financial interest.

32. During the relevant period, Weinmann and Vassallo provided customers with bid and/or ask prices without disclosing that they were doing so for the benefit of their trading on behalf of accounts that they controlled, and that they were not merely relaying the interest of third parties.

33. On more than 2,000 occasions, Weinmann executed block trades on behalf of Buttonwood or Weva as a counterparty opposite Coquest customers without their customers' prior consent allowing Buttonwood or Weva to take the opposite side of their orders.  Nonetheless, Coquest charged brokerage commissions or fees to its customers for many of these trades without disclosing that he was acting as the counterparty.

34.     During the relevant period, Weinmann block traded, or attempted to block trade, on behalf of Buttonwood and Weva, based on confidential customer information he had access to by virtue of being a Coquest broker.

**D.  Obtaining Less Favorable Prices for Customers**

35.     During the relevant period, Coquest customers asked Coquest block trade brokers to provide bid and/or ask prices for particular futures contracts and options on futures in particular quantities.  Customers expected that Coquest would quote the most favorable prices that Coquest knew to be available in the market, at which point the customers could enter orders to transact at the prices quoted, attempt to negotiate more favorable prices (using Coquest as an intermediary), or decide not to transact.

36.     Coquest customers had no realistic way to determine whether Coquest quoted them the best prices that the Coquest brokers knew to be available in the market.

37.     On numerous occasions, Weinmann, acting in his capacity as AP of Coquest, offered customers prices that were less favorable (from the perspective of the Coquest customer) than prices that he knew to be available in the marketplace for the particular commodity at the particular quantity the customer desired.

38.     When Coquest customers unknowingly agreed to transact at prices that were, unbeknownst to them, less favorable than prices available elsewhere in the market, Weinmann executed block trades opposite the customers on behalf, and to the benefit, of Buttonwood or Weva accounts that he controlled.

39.     For example, on June 9, 2015, a trader for Coquest Customer A communicated a block trade inquiry to Weinmann in which the trader sought to roll a short position in West Texas Intermediate crude oil futures from June 2015 to July 2015, and Weinmann executed that trade as follows:

| Trader A | (9:27 AM): | i have to leave for a coffee |
| Trader A | (9:27 AM): | but need to roll 25k?[1] |
| Trader A | (9:27 AM): | june to july |
| Weinmann | (9:27 AM): | ok |
| Weinmann | (9:27 AM): | you want me to do it and type it over so you can get your coffee |
| Trader A | (9:28 AM): | yes please |
| Weinmann | (9:35 AM): | you buy 25 M at 6020 and sell 25 N at 6055 (.35 you collect on spread) nymex cleared |

40.     Shortly thereafter, Coquest reported the following block trades to CME as having been executed between Customer A and Buttonwood:

| Date | Time Reported | Buyer | Seller | Product | Price |
|------|---------------|-------|--------|---------|-------|
| 6/9/2015 | 9:35:34 AM | Customer A | Buttonwood | June 2015 WTI Financial Fut | $60.20 |
| 6/9/2015 | 9:35:34 AM | Buttonwood | Customer A | July 2015 WTI Financial Fut | $60.55 |

41.     Weinmann did not disclose to Trader A or Customer A that he would be taking the other side of the block trade on behalf of any account he controlled.  Coquest charged Customer A a total of $250 in commissions for the trades.

42.     Nor did Weinmann disclose to Trader A or Customer A that better prices were available in the market.  Yet within four minutes, Buttonwood profitably exited its position by buying June WTI futures for a price lower than Customer A had paid and selling July WTI futures for a price higher than it had paid Customer A:

| Date | Time Reported | Buyer | Seller | Product | Price |
|------|---------------|-------|--------|---------|-------|
| 6/9/2015 | 9:37:43 AM | Buttonwood | Counterparty | June 2015 WTI Financial Fut | $59.95 |
| 6/9/2015 | 9:39:36 AM | Counterparty | Buttonwood | July 2015 WTI Financial Fut | $60.60 |

---

[1] Trader A's phrase "roll 25k" under the customary language used in oil trading, means to move 25,000 barrels of Customer A's short position in crude oil from June 2015 to July 2015.

43.     As a result of these back-to-back trades, Buttonwood's Galaxy Plus Fund made $7,500 in gross trading profits in a matter of minutes:

| Buttonwood WTI Trading Overview 6/9/2015 | | | | |
|---|---|---|---|---|
| Product | Price Paid | Price Received | Volume | Profit |
| June WTI | $59.95 | $60.20 | 25,000 barrels | $6,250 |
| July WTI | $60.55 | $60.60 | 25,000 barrels | $1,250 |

44.     Customer A suffered a corresponding loss of $7,500 compared to its financial position if it had been able to trade at the best prices known by Coquest to be available.

45.     Similarly, on March 3, 2017, a Coquest junior broker contacted Coquest Customer C regarding AO puts, which are options traded on NYMEX that give the holder the right to sell West Texas Intermediate crude oil futures at a specified price on or before a specified date.  At 10:13 a.m., Customer C indicated that it would be willing to pay $1.50 per contract for AO puts giving it the right to sell 6,000 barrels of crude oil for $44 per barrel.

46.     At 10:19 a.m., Weinmann contacted Coquest Customer D soliciting a price to buy AO puts at $44.  Customer D offered to sell the AO puts for $1.13 per contract.

47.     As an introducing broker, Coquest could and should have matched Customer C's buy order with Customer D's sell order and entered a transaction between those counterparties at $1.13 per contract.

48.     Instead, at 10:23 a.m. Weinmann executed a block trade in which Buttonwood bought AO puts for $1.13 per contract from Customer D.  Also, at 10:23 a.m., the Coquest junior broker executed a block trade in which Buttonwood sold those same AO puts for $1.48 per contract to Customer C.  Coquest, Weinmann, and the junior broker did not inform Customer C or Customer D that Buttonwood had taken the opposite side of their trades.

49.     As a consequence of its offsetting block trades, Buttonwood's Galaxy Plus fund obtained nearly instant and riskless gross trading profits of $2,100:

| Buttonwood AO Put Trading Overview 3/3/2017 | | | |
|---|---|---|---|
| Product | Price Paid | Price Received | Profit |
| AO Put $44 | $1.13 x 6,000 barrels = $6,780 | $1.48 x 6,000 barrels = $8,880 | $2,100 |

50.     Customer C paid an additional $2,100—over 30% more—for the AO options compared to what it would have paid if it had been able to buy at the best available price known to Coquest:

| Customer C Put Trading Overview 3/3/2017 | | | |
|---|---|---|---|
| Product | Actual Price Paid | Best Price Available | Loss |
| AO Put $44 | $1.48 x 6,000 barrels = $8,880 | $1.13 x 6,000 barrels = $6,780 | $2,100 |

51.     In another example, on March 9, 2017, Customer E, a Coquest customer, contacted a Coquest junior block trade broker and expressed an interest in selling 900,000 MMBtu of certain natural gas futures at $3.40 or more per MMBtu.  The junior broker notified Weinmann of Customer E's order, and Weinmann sought an offer from Customer F, who offered to buy the same natural gas futures for $3.402 per MMBtu.

52.     Rather than notifying Customer E of the best price he had found in the market, Weinmann executed a block trade in which Buttonwood sold 900,000 MMBtu of natural gas futures to Customer F at a price of $3.402 per MMBtu.  Seconds later, the junior broker executed a block trade in which Buttonwood bought 900,000 MMBtu of the same natural gas futures from Customer E at a price of $3.40 per MMBtu.  Coquest, Weinmann, and the junior broker did not inform Customer E or Customer F that Buttonwood had taken the opposite side of their trades.

53.     As a consequence of its offsetting block trades, Buttonwood's Galaxy Plus fund obtained nearly instant and riskless gross trading profits of $1,800:

| Buttonwood Natural Gas Trading Overview 3/9/2017 | | | | |
|---|---|---|---|---|
| Product | Price Paid | Price Received | Volume | Profit |
| Nat. Gas Fut. | $3.40 per MMBtu | $3.402 per MMBtu | 900,000 MMBtu | $1,800 |

54.     Customer E received $1,800 less for the natural gas futures than it would have received if it had been able to sell at the best available price known to Coquest:

| Customer E Natural Gas Trading Overview 3/9/2017 | | | | |
|---|---|---|---|---|
| Product | Actual Price Received | Best Price Available | Volume | Loss |
| Nat. Gas Fut. | $3.40 per MMBtu | $3.402 per MMBtu | 900,000 MMBtu | $1,800 |

55.     Subsequent to these transactions, Coquest sent Customer E a trade confirmation charging $450 "for brokerage services rendered on this deal," which stated that Coquest "acted as agent for both parties solely for the purpose of matching up the parties to the transaction."

56.     Customer E believed that Coquest was acting as a broker, not on behalf, and for the benefit, of Buttonwood, during the negotiation and execution of this block trade.

57.     Besides examples described above, Weinmann, on behalf of Coquest, Buttonwood, and Weva, engaged in similar simultaneous trades seeking similar arbitrage profits on dozens of other occasions.

58.     In addition to seeking immediate arbitrage profits from simultaneous trades opposite Coquest customers, Buttonwood and Weva also frequently held for longer periods the positions that they had obtained by trading against Coquest customers, and were able to exit these positions profitably.

59.     On hundreds of occasions during the relevant period, Buttonwood took a position by executing a block trade opposite a Coquest customer and exited that position within the same trading day.  On those occasions, Buttonwood obtained a trading profit on approximately 87% of its trades opposite Coquest customers, it broke even on approximately 5% of these trades, and it suffered a trading loss on only about 8% of its trades opposite Coquest customers.

60.     Buttonwood's extremely high rate of profitable trades demonstrates that it did not trade against Coquest customers at neutral, market prices.  Rather, Weinmann executed block trades

at prices that were so favorable to Buttonwood and Weva (and unfavorable to the Coquest customers) that Buttonwood and Weva could profitably exit the positions they took opposite Coquest customers even when the market moved away.  This rate of profitable trading was made possible only by Weinmann's use of Coquest customers' material, nonpublic information to making trading decisions on behalf of Buttonwood and his deception of Coquest customers into believing he was offering the best prices at which other market participants were willing to trade when in fact he was offering only the prices at which he was willing to trade on behalf of Buttonwood.

### E.  Misleading Customers About Trading Counterparties

61.    During the relevant period, Weinmann routinely made affirmative false or misleading statements via IM to Coquest customers in order to deceive the customers into believing that they were negotiating with, or trading opposite, some other third party in the marketplace when in fact they were negotiating with Weinmann and trading opposite Buttonwood or Weva.

62.    For example, on June 4, 2015, Coquest Customer G communicated a desire to participate in a block trade in which Customer G would buy certain natural gas futures as follows:

| Trader G | (9:33 AM): | offer on 1/4 a day Z6-G7 chicago? |
| Weinmann | (9:34 AM): | coming |
| Weinmann | (9:35 AM): | 1450 offer |
| Weinmann | (9:37 AM): | did you like that |
| Trader G | (9:38 AM): | i was thinking 1/2 cent better, |
| Trader G | (9:38 AM): | at least… :0 |
| Weinmann | (9:39 AM): | you 14 bid |
| Trader G | (9:39 AM): | yes plz |
| Weinmann | (9:40 AM): | at 1425 |
| Trader G | (9:41 AM): | i'm firm on the 14 |

14

| Weinmann | (9:41 AM): | ok ill tell them |
| Trader G | (9:41 AM): | ok, ty |
| Weinmann | (9:43 AM): | he said your screwing him but he thinks he will do it! |
| Weinmann | (9:43 AM): | so your done |

63.     After this IM exchange, Weinmann entered a block trade in which Buttonwood sold Chicago basis futures to Trader G for $.14 per Btu.

64.     During the negotiation, Weinmann attempted to actively mislead Trader G by falsely indicating that he needed to report Customer G's bid to "them" and by reporting that the supposed counterparty "said your screwing him" before accepting Customer G's bid.  In reality, Weinmann was the trading counterparty and he was attempting to surreptitiously negotiate a higher sale price for the futures on behalf of Buttonwood, which he partially owned and controlled.

65.     Weinmann regularly and repeatedly made similar false or misleading statements in other IM conversations.  For example, he falsely reported to another Coquest customer that a potential trading counterparty "said last look at 2725" (meaning that the best price the counterparty would offer was $.2725), when in fact Weinmann was again surreptitiously the counterparty negotiating on behalf of Buttonwood.

66.     In another instance, Weinmann falsely IM'd another Coquest customer that a potential counterparty "asked if you get to -11" (meaning that the counterparty asked whether the Coquest customer would be willing to buy for -$.11), when in fact Weinmann was trying to obtain that price in a trade for Buttonwood.

67.     Perhaps most egregiously, on one occasion when a Coquest customer complained about a price Weinmann had shown, Weinmann defended himself by falsely saying, "I don't make it up, I just get buyiong [sic] and seller to meet."  In that instance, Weinmann actually had made up

15

the price which was a beneficial sale price for Buttonwood. After Weinmann's comment, the Coquest customer ultimately traded opposite Buttonwood, though the customer did not know that Weinmann controlled the counterparty on the other side of the trade.

68.    Weinmann made these false or misleading statements willfully to deceive or to attempt to deceive Coquest customers in the execution of trades.

### F.  Supervision Failures

69.    Despite the readily apparent conflicts of interest raised by Weinmann's block trading on behalf of Buttonwood and Weva while still acting as a block trade broker for other Coquest customers, Coquest did not establish, implement, or enforce any policies or procedures to monitor Weinmann's block trading on behalf of Buttonwood and Weva or to ensure that the trading was not to the detriment of Coquest customers.

70.    For example, Coquest did not have policies or procedures in place or otherwise attempt to detect or prevent Weinmann's misuse of the confidential customer information to which he had access by virtue of his role on the brokerage desk.

71.    Further, Coquest did not review Weinmann's trading activities for evidence of misappropriation of material, nonpublic information, or other trading abuses.

72.    During the relevant period, Coquest maintained no policies relating to its block trade brokers trading on nonpublic information. Nor did Coquest have any rules in place about brokers trading against their brokerage customers.

73.    During the relevant period, Coquest had no rules or limitations in place on Weinmann's ability to carry out his dual roles as block trade broker for Coquest and trader in the same product markets for Buttonwood and Weva. Coquest provided no training during the relevant period about how to treat or execute block trades between Coquest customers and Buttonwood or Weva.

74.     During the relevant period, Vassallo supervised Coquest's block trade brokers, including Weinmann, and was Coquest's compliance officer.

75.     Buttonwood did not establish, implement, or enforce any policies or procedures to monitor Weinmann's trading to ensure that it was compliant with the applicable rules and regulations despite the readily apparent conflicts of interests that his trading, while still acting as a block trade broker for other Coquest customers, created.  During the relevant period, Buttonwood had no compliance policies or personnel of any kind.

## VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT I

### Violation of Regulation 155.4, 17 C.F.R. § 155.4 (2020)

### (Against Coquest, Buttonwood, Weva, Weinmann, and Vassallo)

76.     Paragraphs 1 through 75 are realleged and incorporated herein by reference.

77.     17 C.F.R. § 155.4(a) provides, in relevant part, that all IBs must establish and enforce internal rules, procedures, and controls to:

> Insure, to the extent possible, that each order received from a customer which is executable at or near the market price is transmitted to the futures commission merchant carrying the account of the customer before any order in any future or in any commodity option in the same commodity for any proprietary account, or any other account in which an affiliated person has an interest, or any account for which an affiliated person may originate orders without the prior specific consent of the account owner, if the affiliated person has gained knowledge of the customer's order prior to the transmission to the floor of the appropriate contract market of the order for a proprietary account, an account in which the affiliated person has an interest, or an account in which the affiliated person may originate orders without the prior specific consent of the account owner.

78.     During the relevant period, Coquest violated 17 C.F.R. § 155.4(a) by failing to establish or enforce any internal rule, procedure, or control to ensure that Coquest customer orders

were transmitted prior to futures and options orders in the same commodity for Buttonwood and Weva.

79.    17 C.F.R. § 155.4(b)(2)(i) provides, in relevant part, that no IB or any of its affiliated persons shall:

> Knowingly take, directly or indirectly, the other side of any order of another person revealed to the introducing broker or any of its affiliated persons by reason of their relationship to such person, except with the other person's prior consent and in conformity with contract market rules approved by or certified to the Commission.

80.    During the relevant period, Weinmann and Vassallo violated 17 C.F.R. § 155.4(b) by knowingly taking the other side of customer orders revealed to Coquest or any of its affiliated persons by reason of the customers' relationship with Coquest without the customers' prior consent.

81.    The foregoing acts, omissions, and failures of Weinmann and Vassallo occurred within the scope of their employment, office, or agency with Coquest, Buttonwood, and Weva. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Coquest, Buttonwood, and Weva are liable for Weinmann and Vassallo's violations of 17 C.F.R. § 155.4(b).

82.    Each instance in which Weinmann or Vassallo unlawfully traded against a Coquest customer without the customer's prior consent is alleged as a separate and distinct violation of 17 C.F.R. § 155.4(b).

## COUNT II

### Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2020)

### (Against Coquest, Buttonwood, Weva, and Weinmann)

83.    Paragraphs 1 through 82 are re-alleged and incorporated herein by reference.

84.    7 U.S.C. § 9(1) provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . .

85. 17 C.F.R. § 180.1(a), provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

86. During the relevant period, Weinmann violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) by, in connection with contracts for future delivery and options on futures on or subject to the rules of any registered entity:  (i) intentionally or recklessly trading on the basis of material, nonpublic information in breach of a pre-existing duty owed to Coquest customers; (ii) intentionally or recklessly trading against Coquest customers at prices less favorable than he knew or should have known to be available in the market in order to benefit Buttonwood and Weva at the Coquest customers' expense; (iii) intentionally or recklessly deceiving or attempting to deceive customers into believing that he was reporting bids and offers made by some third party trading counterparty when in fact Weinmann was making the bids or offers on behalf of accounts that he traded; and/or (iv) intentionally or recklessly engaging, or attempting to engage, in acts,

practices, or a course of business which operated or would operate as a fraud or deceit upon other persons.

87.     The foregoing acts, omissions, and failures of Weinmann occurred within the scope of his employment, office, or agency with Coquest, Buttonwood, and Weva. Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2020), Coquest, Buttonwood, and Weva are liable for Weinmann's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

88.     Each fraudulent or deceptive act, including each instance in which Weinmann traded on the basis of material, nonpublic information, traded against customers at prices less favorable than those that he knew or should have known to be available, or deceptively caused his customers to believe that he was merely acting as the broker for the trade when in fact he was acting as the counterparty, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

## COUNT III

### Violation of Section 4b(a)(1)(A), (B), and (C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C) (2018)

### (Against Coquest, Buttonwood, Weva, and Weinmann)

89.     Paragraphs 1 through 88 are realleged and incorporated herein by reference.

90.     7 U.S.C. § 6b(a)(1) provides, in relevant part:

It shall be unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person:

(A) to cheat or defraud or attempt to cheat or defraud the other person;

(B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

20

(C) willfully to deceive or attempt to deceive the other person by any
means whatsoever in regard to any order or contract or the disposition
or execution of any order or contract, or in regard to any act of agency
performed, with respect to any order or contract for . . . the other
person.

91.     During the relevant period, Weinmann violated 7 U.S.C. § 6b(a)(1)(A)-(C) by, in

connection with orders for or on behalf of other persons to make contracts of sale of commodities

for future delivery subject to the rules of a designated contract market:  (i) intentionally or

recklessly trading on the basis of material, nonpublic information in breach of a pre-existing duty

owed to Coquest customers; (ii) intentionally or recklessly trading against Coquest customers at

prices less favorable than he knew or should have known to be available in the market in order to

benefit Buttonwood and Weva at the Coquest customers' expense; (iii) intentionally or recklessly

deceiving or attempting to deceive customers into believing that he was reporting bids and offers

made by some third party trading counterparty when in fact Weinmann was making the bids or

offers on behalf of accounts that he traded; and/or (iv) intentionally or recklessly cheating,

defrauding, attempting to cheat or defraud, deceiving, and attempting to deceive other persons in

regard to their orders or executions of orders or in regard to the acts of agency performed for the

other persons.

92.     The foregoing acts, omissions, and failures of Weinmann occurred within the scope

of his employment, office, or agency with Coquest, Buttonwood, and Weva.  Therefore, pursuant to

7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Coquest, Buttonwood, and Weva are liable for

Weinmann's violations of 7 U.S.C. § 6b(a)(1)(A)-(C).

93.     Each fraudulent or deceptive act, including each instance in which Weinmann traded

on the basis of material, nonpublic information, traded against customers at prices less favorable

than those that he knew or should have known to be available, or deceptively caused his customers

to believe that he was merely acting as the broker for the trade when in fact he was acting as the counterparty is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(1)(A)-(C).

## COUNT IV

### Violation of Regulation 166.3, 17 C.F.R. § 166.3 (2020)

### (Against Coquest, Buttonwood, Weinmann, and Vassallo)

94.     Paragraphs 1 through 93 are realleged and incorporated herein by reference.

95.     17 C.F.R. § 166.3 requires:

> Each Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) of all commodity interest accounts carried, operated, advised or introduced by the registrant and all other activities of its partners, officers, employees, and agents (or persons occupying a similar status or performing a similar function) relating to its business as a Commission registrant.

96.     Weinmann and Vassallo, as the only supervisors at Coquest, violated 17 C.F.R. § 166.3 by, among other things:  (i) failing to establish, implement, and enforce policies or procedures to detect and prevent Weinmann and Vassallo's misuse of confidential customer information; (ii) failing to review Weinmann's trading on behalf of Buttonwood and Weva to determine whether it conflicted with his brokerage services he provided to Coquest customers; and (iii) failing to establish, implement, or enforce policies or procedures governing its brokers' handling of customer orders and the protection of confidential customer information.

97.     The foregoing acts, omissions, and failures of Weinmann, and Vassallo relating to insufficient supervision occurred within the scope of their employment, office, or agency with Coquest and Buttonwood.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Coquest and Buttonwood are liable for the acts, omissions, and failures constituting violations of 17 C.F.R. § 166.3.

98.     Each failure to supervise, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 166.3.

## VII.     RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to its own equitable powers:

A.     Find that Coquest violated Sections 4b(a)(1)(A)-(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C), 9(1) (2018), and Regulations 155.4, 166.3, and 180.1(a)(1)-(3), 17 C.F.R. §§ 155.4, 166.3, 180.1(a)(1)-(3) (2020);

B.     Find that Buttonwood violated 7 U.S.C. §§ 6b(a)(1)(A)-(C) and 9(1) and 17 C.F.R. §§ 155.4, 166.3, and 180.1(a)(1)-(3);

C.     Find that Weva violated 7 U.S.C. §§ 6b(a)(1)(A)-(C) and 9(1) and 17 C.F.R. §§ 155.4 and 180.1(a)(1)-(3);

D.     Find that Weinmann violated 7 U.S.C. §§ 6b(a)(1)(A)-(C) and 9(1) and 17 C.F.R. §§ 155.4, 166.3, and 180.1(a)(1)-(3);

E.     Find that Vassallo violated 17 C.F.R. § 155.4 and 166.3.

F.     Enter an order of permanent injunction enjoining Coquest, and its affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6b(a)(1)(A)-(C) and 9(1) and 17 C.F.R. §§ 155.4, 166.3, and 180.1(a)(1)-(3);

G.     Enter an order of permanent injunction enjoining Buttonwood, and its affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in

the conduct described above, in violation of 7 U.S.C. §§ 6b(a)(1)(A)-(C) and 9(1) and 17 C.F.R. §§ 155.4, 166.3, and 180.1(a)(1)-(3);

H.      Enter an order of permanent injunction enjoining Weva, and its affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6b(a)(1)(A)-(C) and 9(1) and 17 C.F.R. §§ 155.4 and 180.1(a)(1)-(3);

I.      Enter an order of permanent injunction enjoining Weinmann, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6b(a)(1)(A)-(C) and 9(1) and 17 C.F.R. §§ 155.4, 166.3, and 180.1(a)(1)-(3);

J.      Enter an order of permanent injunction enjoining Vassallo, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 17 C.F.R. §§ 155.4 and 166.3;

K.      Enter an order of permanent injunction restraining and enjoining Defendants, as well as their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1.   Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

2.   Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2020)), for accounts held in the name of

any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3. Having any commodity interests traded on any Defendant's behalf;

4. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5. Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2020), and/or;

7. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2020)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

L.    Enter an order directing Defendants to pay, jointly and severally, restitution to customers to every person who sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

M.    Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading

profits derived, directly or indirectly, from acts or practices which constitute violations of the Act

and Regulations as described herein, including pre-judgment and post-judgment interest;

      N.      Enter an order directing Defendants to pay civil monetary penalties, to be assessed

by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act,

7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties

Inflation Adjustment Act Improvements Act of 2014, Pub. L. 114-74, 129 Stat. 584, title VII,

Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2020), for each violation of the Act and

Regulations, as described herein;

      O.      Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2413(a)(2) (2018); and

      P.      Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.


Date: October 20, 2021                Respectfully submitted,

                                      s/ Douglas G. Snodgrass

                                      Douglas G. Snodgrass (Illinois Bar #6297661)
                                      David A. Terrell (Illinois Bar #6196293)
                                      Scott R. Williamson (Illinois Bar #6191293)
                                      COMMODITY FUTURES TRADING COMMISSION
                                      Division of Enforcement
                                      525 W. Monroe Street, Suite 1100
                                      Chicago, IL 60661
                                      Telephone:  (312) 596-0700
                                      Facsimile:  (312) 596-0714
                                      E-mail:       dsnodgrass@cftc.gov
                                                    dterrell@cftc.gov
                                                     swilliamson@cftc.gov